## STATE v. WYSE.

1. Whenever the trial judge allows his opinion, upon any issue of fact in the case, or as to the force and effect of any testimony upon such issues, to reach the jury through his charge, the Constitution of the State is violated. *Art. IV.*, § 26. The defendant, charged with murder, having pleaded "not guilty," the judge charged upon the facts when he told them that it was not a case of manslaughter, and when he communicated to them his own impressions adverse to the truth of the defendant's testimony.

2. The constitution guarantees the continuance of the right to a trial by jury as it then existed (*Art. I.*, § 11); but such right is not affected by a statutory reduction of the number of peremptory challenges allowed to a prisoner charged with felony.

3. From the refusal of the trial judge to order the jury to be polled when demanded, no appeal lies.

4. The law of murder was correctly charged in this case.

5. A juror sworn on his *voir dire* answered the usual questions in the negative, except that in answer to the question, whether he had formed any opinion on the case, he answered, "Not particularly"; but when again interrogated, " 'Not particularly' won't do. Have you formed any opinion?" he answered "No." He was then directed to be sworn. *Held*, that there was no ground for this court to interfere.

6. Defendant cannot introduce evidence of declarations made by the deceased after he received the mortal wound, but not under the apprehension of certain death.

7. The trial judge refused to permit defendant's witness to say whether or not defendant was "trying to get out of the way," just before the homicide, the judge saying that the witness must state facts. *Held*, that the question was properly excluded, as it sought to obtain the expression of an opinion.

Before PRESSLEY, J., Lexington, June, 1889.

Julius Wyse was indicted for the murder of Willis Stork, in the town of Lexington, on February 23, 1889. At the trial, O. J. Duffie, a juror, was sworn on his *voir dire*, and interrogated by the court as follows: "Q. By the Court: Are you related to any of the parties in this case?. A. No, sir. Q. Have you expressed any opinion in it? A. No, sir. Q. Have you formed any opinion on the case? A. Not particularly. Q. 'Not particularly' wont do. Have you formed any opinion? A. No, sir.

Q. Are you sensible of any bias or prejudice either for or against him ? A. None at all." Defendant objected to the juror being presented, but the objection was overruled. Defendant then challenged this juror peremptorily.

Before any of the jurors were sworn, defendant contended that the statute reducing the number of peremptory challenges was unconstitutional. The judge ruled that it was not, and defendant excepted.

Wade A. Caughman, policeman, a witness for defence, having testified to certain quarrels between the prisoner and the deceased on the night of the homicide, was asked. "Was, or was not, Julius Wyse trying to get out of the way that night" before the fatal wound was inflicted? On objection by the solicitor, the court ruled the question to be inadmissible, saying, "That is his opinion—he must state facts."

The judge charged the jury as follows :

It is contended in this case, first, that when all the circumstances of the case are before the jury, the State must prove malice in order to make it a question of malice. My charge to you on that point is, that when one man wilfully inflicts with a deadly weapon a wound upon another which is fatal, the law implies that it was done maliciously, and holds him responsible for having done it maliciously : and if the circumstances of the case show that it was done while the parties were quarrelling—were angry with each other—then the State by proving that does prove malice, unless those same circumstances show that it was a case of manslaughter, by the blow having been inflicted in sudden heat and passion after sufficient provocation, or the blow having been inflicted in self-defence, when he had reason to believe that if he didn't do it, either his own life was in danger, or that he was in jeopardy of receiving serious bodily injury. Now, if they were quarrelling. and that was done in the quarrel, it is murder, unless the circumstances make out a case of manslaughter or a case of self defence. That is my charge to you on the law. I am responsible for that. If I err, his life is. in no danger, because there is a court which overrules what I do, when I err in law. I charge you that is the law, upon which there is not a shadow of doubt, well settled for centuries.

Now, gentlemen, it is admitted that this prisoner inflicted the blow with a knife, and the physician testified that that blow caused lock jaw, which resulted in death. So, then, he is guilty of murder, having done it in anger when they were quarrelling, and the damn lie having passed between them; he is guilty of murder, unless it is a case of manslaughter. Well, that is not contended for; the defence does not claim it is a case of manslaughter. In order to make out a case of manslaughter, the blow must have been inflicted in sudden heat and passion, after sufficient provocation; and no words are recognized in law as sufficient provocation—it must have been a blow, or something equivalent to a blow, in order to make it a case of manslaughter.

Then, is it a case of self-defence? The only witness you have in all the case that lays any foundation whatever for it being self-defence is the defendant himself; he is the only person who testifies to any facts whatever that point towards self-defence. It is claimed that in order to determine the value of his testimony, and what occurred at that time, you must consider all the circumstances of the case. You heard my ruling—that what previously occurred in the street had nothing to do with the case, in so far as justification for this act was concerned, but it would bear upon the question of what the defendant had a right to expect when this quarrel was renewed in the store; it would bear upon that. So, in considering now whether he believed he was in danger, or whether the circumstances justified his believing that he was in danger, or would justify a man of reasonable firmness and coolness in believing he was in danger; in considering that point, you will consider all the circumstances as proved by the testimony.

Now, what weight will you give to what he says? It is claimed when he says that he saw the deceased try to draw a knife, that that matter is not contradicted by any number of witnesses, who will say that he didn't see it. Well, that is the general rule of law; but the general rule of law is this, that if the witnesses who were present testify to you in such manner as to induce you to believe that they must have seen all that occurred, then their testimony will contradict that of the other person, who says that he saw so and so; because, gentlemen, if the circumstances of the case, added to their testimony, contradict his testimony, then his

testimony is contradicted. Now, what circumstances are you to consider in connection with this matter of drawing a knife? what circumstances are you to consider, in addition to that of the other witnesses whose testimony you have heard, about there being no knife; from what circumstances are you to consider? The moment he struck the blow, he ran; did he do any act or say anything then, while the matter was present, to lead the other witnesses to a knowledge of the fact, that a knife was being drawn upon him? did he at that time say a word to justify himself for that blow? You are to consider that.

What other circumstances? He ran, but his blow did not disable the deceased man at that time; no witness says that he fell—that he became disabled. If he did have a knife, was there any attempt to use it after he was cut? It is for you to weigh the fact as sensible men—if he was drawing a knife, or making a motion to draw a knife, would he not have followed it up after he received the cut? But what else? Not only does it appear he didn't intend to use any knife, but he ran for a weight and picked the weight up. Now, what hand would he be likely to pick it up with? Would he do it with his right hand or not? If he did it with his right hand, didn't that give an opportunity for everybody to see the knife? Did the knife drop? What became of it? All these matters you must weigh; and although it is the rule of evidence, that what another man didn't see does not contradict what a credible witness says he did see; still, if what those others swear to are inconsistent with the facts he swears to, that does contradict him.

Furthermore, this rule of law was made as applicable to a disinterested witness. Now, in weighing the testimony of this man as to the deceased about to draw a knife on him—or his supposing so—you are bound to consider the situation in which he testifies; you are bound to weigh it. He is being tried for his life. Well, Satan once said to the Almighty, when the Son of God appeared before him, in talking about Job, after Job had all his property and all his children taken from him, Satan told one truth: "All that a man hath will he give for his life." Is it true or not? It is for you. I say Satan told what is generally recognized as a truth, but you must judge whether true or not. Is it true that

all that a man hath will he give for his life? If, then, one whose life is in danger will give all he has to save it, or will give much that he has to save it, it is for you to say what pressure there was on the mind of this witness, when he testified, to depart from the truth. That is a matter for you to weigh.

If, then, in weighing that testimony, and in making such allowance for his testimony as you are bound to make under the circumstances of the case, then what proof is there before you that this blow was inflicted in self-defence? Well, now, begin with the policeman. He says that these persons were quarrelling in the street; that they were quarrelling with and cursing each other; that he interfered and stopped them more than once. Does he say a word about having seen a knife in any of those quarrels? He says, finally, when he interfered for the last time and stopped them, he told the defendant to go away, and the defendant replied, "Well, now, I am done with it," and did go away; that the deceased stopped behind, and afterwards he went on down the street in the direction of this store; that he saw the deceased was following him; that he then warned the deceased not to follow the party, or they would get into a fight; but he says nothing about their having attempted to fight—either by weapon or otherwise—at any time he saw them. Simply, they were quarrelling with and cursing each other; but he does not say a word about their having offered to fight each other with a deadly weapon of any sort. Now, those are the circumstances of the case testified to by him previous to going in that store; and despite his warning, that if Willis, the deceased, would go in that store they would get in a difficulty and one or the other get hurt, he did go in.

Now, what happened after he went in? All that you and I know about it is what the witnesses say; and it is for you to say how far they have told the truth. Willie Strother says that defendant came in first; that after he came in, he says to him, "Are you a friend to Willis Stork?" "I told him yes," he says; "he then replied, 'If he comes in here to-night, I will cut his throat.'" That is what he says; and that he went on cursing and talking about some money matter about which Stork behaved badly; that while this talk was going on, Stork came in at the side door and walked in and walked around and went up to where the defen-

4 -32

dant was sitting and said to him, "What are you talking about me for?" and from that they got to cursing each other; that his attention just at that time was directed some other way, so he didn't see the blow struck, but he saw the effect of it immediately after it was done; that the defendant had cut him, and Willis Stork so called out. The next witness, Dukes, says pretty much the same thing; he says he was in the store, that the defendant came in first and asked him whether he was a friend of Willis Stork; he says, "I told him yes, and when I told him that, I thought he meant was I a friend to Willie Strother." Then he went on, he says, cursing about Stork, who came in soon after, and they got to quarrelling. He says defendant said he wanted no fuss, and Stork said he wanted no fuss; he said both said they wanted no row; still they went on quarrelling and cursing each other until the defendant—who was sitting down at the time, Stork standing up, near each other—rose and cut him. Now, that is his testimony.

Sol. Meetze says that he was in the store, that he saw the lick; that defendant came in first and had his knife open when he came in, and he said he would "cut the throat of somebody, but I didn't hear the name; heard him say he would cut the throat of somebody, but I didn't hear the name." Willis came in, he says, soon after, whilst defendant was talking, and asked defendant what he was talking about him for; then they began cursing; then he said defendant said, "I want no fuss," and Stork said, "I want none"; still they went on cursing each other, and he says it resulted in defendant rising in his seat and striking a blow; that defendant ran forward, he says, and Stork ran backward and picked up a weight. Mr. Meetze stopped him, "Don't throw any weight here; you better go for a doctor." You see by the testimony of the witness, that he was even strong enough, not only to pick up a weight, but to run for a doctor, after he was told by Mr. Meetze to go for a doctor.

These are the circumstances of the case, as detailed by the witnesses for the State; and in reply to that, there is no testimony by the defence, excepting that Mr. Muller states that, riding in the hack, Willie Strother told him certain things which Willie Strother now denies on the stand having told him. Supposing

what Mr. Muller says makes you doubt the testimony of Willie Strother, the question still is, do not the other three witnesses who were present tell the same tale, and are they discredited in any way?

Now, gentlemen, weigh these matters carefully. It is a serious matter; it is a serious matter to me as well as to you. I always feel the burden of a case of this sort. I feel it; but I feel the burden of both sides. First, I must not have the life of this man on my hands—the blood of this man on my hands—by any error that I may commit, or any hasty judgment I may reach; I must not have it. And, next, I must not have any of the blood of the deceased man on my skirt by any failure to do my duty. This is exactly the spirit in which I go in any case of this sort in the discharge of the duty which the law casts upon me. I feel the responsibility of being void of either one of them. I must do my duty. Doing my duty, I charge you on the law, and I call the testimony to your attention; you are to weigh it, and you are to say who of these witnesses are credible, and who are not. Saying that, the question is now, will you say that the defence has made out a reasonable case of self-defence? In other words, did he believe at the time he struck that blow with the knife, that if he didn't strike it, his own life was in danger, or that he was in danger of receiving bodily harm? And not only did he believe that, but did the circumstances of the case, taking them all together, justify a reasonably firm and prudent man in having such belief? In your estimation, did the circumstances, as proved before you, justify a reasonable and ordinarily firm person in having any such belief? If you cannot reach that conclusion upon his testimony, then, gentlemen, you are bound to say "guilty"; but if you reach that conclusion from his testimony and the other circumstances, then you are bound to say "not guilty." There is no room, no testimony, for a verdict of manslaughter.

The jury were brought out of their room at 11 o'clock p. m., and asked by the court if they desired any further explanation of the law, or wanted any of the testimony read to them. The foreman said they had already agreed, except one juror. The juror referred to got up and asked the court had the prisoner the privi-

lege to decide himself when it was necessary to cut? The Court replied: "The law is, if he believes he is in danger at the time he strikes; provided, however, that the jury, after hearing the testimony and all the circumstances, think that he was justified in that belief; from all the circumstances as testified to, if the jury believe that a man of reasonable, calm judgment would have been of the same conclusion."

The jury brought in a verdict of guilty, with recommendation to mercy.

The clerk of the court: That is your verdict; so say you all? No dissenting voice.

Mr. Graham, counsel for defendant, asked that the jury be "polled." Refused by the court. Exception noted.

Defendant appealed upon twenty-three exceptions, covering five printed pages. Exceptions 12, 13, 14, 15, 16, 17, and 18 set forth extracts from the charge, which are alleged to be charges on the facts. Exceptions 5, 6, 9, 10, 11, 19, and 23 were not considered by this court. The other exceptions were as follows:

1. Because his honor erred in denying the defendant the right to twenty peremptory challenges, holding that the act of 1887, reducing the number to ten, was constitutional.

2. Because his honor erred in allowing Duffie, a juror, to be presented, when he had said on his *voir dire* that he had *"not particularly"* formed an opinion in the case.

3. For that his honor erred in holding that the defendant's counsel could not ask witness, Wade A. Caughman, as follows: "Was, or was not, Julius Wyse trying to get out of the way that night? and what would you say about Julius Wyse's actions that night, from the time you separated them?"

4. Because his honor erred in refusing to allow the witness, John Moore, to testify as to declaration of deceased after he was cut.

7. For that his honor refused to allow the witness, Moore, to state the dying declaration of deceased, holding that the witness was not intelligent enough to understand the meaning of a dying declaration.

8. For that his honor erred in refusing to allow the defendant

to testify as to a conversation between himself and Willis Stork on Saturday evening after the cutting took place.

20. Because his honor erred in not defining to the jury the law fully as to the different grades of homicide.

21. That his honor erred in not saying to the jury that the defendant was entitled to all reasonable doubts.

22. Because he erred in holding that the defendant had no right, under the laws of this State, to ask for the jury to be polled.

*Messrs. G. T. Graham* and *Meetze & Muller*, for appellants.

*Mr. Nelson*, solicitor, contra.

January 15, 1890.    The opinion of the court was delivered by

MR. CHIEF JUSTICE SIMPSON.    In this case the appellant was convicted of murder at the June term of the Court of General Sessions for Lexington County, 1889.    He was sentenced to be hanged on Friday, the third day of January, 1890.    He has appealed to this court upon 23 exceptions in number, all of which will be found in the "Case."    Only such of these, however, as lead to the result herein need be mentioned here; the others are either unimportant, or are involved in those discussed. One of the main grounds of complaint, presented in different form in several of the exceptions, but the same in substance, is, that his honor, the presiding judge, charged upon the facts, in violation of the constitutional inhibition on that subject, and as it is upon this ground principally that we have found it necessary to reverse the judgment below, it will be first considered.

The language of the constitution upon this subject is as follows: "Judges shall not charge juries in respect to matters of fact, but may state the testimony and declare the law."    Art. IV., sec. 26.    The inhibition here is positive and imperative, and whether wise or unwise, it is found in the organic law of the State, and when it is disregarded or overlooked or violated in any way, the party aggrieved, upon appeal, is entitled to a reversal of the judgment which the charge complained of may have given rise to, without regard to the merits or character of said judgment, whether otherwise supposed to be well founded or not.

Under our system of judicature, in cases of law resting upon facts, the juries are constituted the sole judges of the facts, untrammelled and uninfluenced by the opinion of the judge; and whenever the judge, as we have held in several cases, allows his opinion as to the truth upon a contested issue of fact, or as to the force and effect of testimony bearing upon such contested issue, to reach the jury, either inadvertently, intentionally, or otherwise, he invades the province of the jury, and transcends the constitutional limitation above referred to, and thereby inevitably makes the judgment rendered in the case subject to a reversal. See *State* v. *Addy*, 28 S. C.. 4; *State* v. *White*, 15 *Id.*, 381; *State* v. *Norton*, 28 *Id.*, 572; *State* v. *Jenkins*, 21 *Id.*, 595; *State* v. *James*, 31 *Id.*, 218.

Now, did his honor below charge upon the facts, in the sense as above stated? Does it appear from the charge that his honor's opinion as to the guilt or innocence of the accused, or as to the force and effect of any portion of the testimony pertinent to that question, was communicated thereby to the jury? The appellant was on trial for his life, charged with homicide. He pleaded not guilty, and the issue was made upon that plea. This issue involved the questions: First. Had a homicide been committed by the appellant, and if so, secondly; what was the degree of the offence committed, whether murder, manslaughter, or excusable homicide. What in law would constitute either of these offences was a question of law, and entirely for the court to define. But what testimony was to be relied on, and what facts this testimony proved, were for the jury, and also whether the facts thus found brought the case under one or the other of the offences mentioned.

Now, without going into a minute analysis of his honor's charge, or of any special portion thereof, we think that upon the charge, taken as a whole, the jury must have been impressed with the idea that his honor thought the case was a case of murder. He said that the defence did not claim manslaughter, and further, in substance, that there was no evidence to sustain such a defence, because, in order to make out that defence, it was necessary to prove blows—words not being sufficient; which, no doubt, as a general proposition is good law, but when stated in connection with the previous part of the charge that the case

could not be a case of manslaughter, implied to the jury that there was no such legal provocation proved as would reduce the crime from murder to manslaughter, which was a question of fact and a most vital one.

Then his honor discussed the question of self-defence, stating very positively that the only testimony that bore upon that question was the testimony of the defendant himself; and from the manner in which he discussed that testimony, we do not see how the jury could have reached any other conclusion than that his honor put little or no confidence in the defendant's statements. So that manslaughter having been ruled out, and the only testimony for self-defence as to its weight and effect having been substantially impeached by the manner in which his honor discussed it, the jury no doubt believed that in the opinion of his honor the case was one of murder, and so found. But whether they so found because they concurred in the opinion of his honor, independently of anything said by him, or because of the weight and influence of that opinion alone, we have no means of knowing. We think the charge when read as a whole is obnoxious to the exception urged by the appellant. The charge should be printed with this opinion.

The exception raising the question as to the constitutionality of the recent act[1] reducing the number of challenges in jury trials, we think is untenable.. True, the constitution declares[2] that "the right of trial by jury shall remain inviolate," and this guarantees the continuance of this *right* as it existed at the time of the adoption of the constitution. But this does not prevent the legislature from regulating this right, provided the fundamental requisites thereof are not impaired or destroyed ; that is to say, provided its number and unanimity and its impartiality are not violated, subject to the exception of the fundamental requisites, such as those mentioned above. The legislatures of many of the States where similar guarantees exist, have changed and altered the rules regulating juries without objection, such as at what times, by what officers, in what manner, and from what class, the jury shall be selected, &c., &c. See *Proffatt on Jury Trials*, section

---

[1] Act of 1887, § 8 ; 19 Stat., 830.

[2] Article I., section 11.

106. And it has been expressly held in some of the States, that the legislature may limit the number of peremptory challenges, even in capital cases, without impinging on the constitutional right. For, as it is said, "This right is to have twelve free and lawful men who are impartial between either party, who will by an una- nimous verdict find the truth of the issue, and any legislation, therefore, which merely points the mode of arriving at this ob- ject, but does not rob it of any of its essential ingredients, can- not be considered an infringement of the right." See *Proff. Jury Tr.*, sec. 106, and the cases there cited in the notes. Also see the case of *Cregier* v. *Bunton*, 2 Strob., 487, which is direct- ly on the point.

Nor can the exception that his honor, the presiding judge, de- clined to allow the jury to be polled prevail. This may be per- mitted, and will not generally be denied in a criminal case ; but it is a matter which in this State, it seems, is addressed to the dis- cretion of the court. See the cases : *State* v. *Allen*, 1 McCord, 525 ; *State* v. *Harden*, 1 Bail., 3 ; and *State* v. *Wise*, 7 Rich., 412.

Nor do we see any error in the charge defining and explain- ing what in law would constitute the crime of murder. When the whole charge on the subject is taken and construed together, we think it presents substantially the true legal idea of murder.

As to exception 2, in reference to the juror, Duffie, who upon his *voir dire* said he had not *particularly* formed an opinion. This was a matter for the determination of his honor, and in the absence of any and all abuse of his discretion, as in this case, we see no reason to interfere.

As to the 4th exception, complaining that the witness, John Moore, was not allowed to testify as to declarations of the de- ceased after he was cut. We know of no principle of law that would sustain this exception. The declarations proposed were not dying declarations, and admissible on that ground ; but they were declarations made, it is true, after the deceased had received the wound from which he died, but not under the apprehension of certain impending death, and therefore there was no guaranty of their truth, such as an oath or the belief of approaching death is

supposed to furnish.   They were nothing more than hearsay, and we think were therefore properly excluded.

As to the exception in reference to the witness, Wade A. Caughman.   It does not appear in the report of the testimony that his honor prevented the witness from testifying as to facts which came under his observation ; he merely excluded the opinion of the witness.

The other exceptions, 9, 10, and 11, need not be adjudged, as the judgment below must be reversed upon the ground stated in the beginning of this opinion.

It is the judgment of this court, that the judgment of the Circuit Court be reversed.